# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KHALIF WATSON, | § | |
| | § | No. 410, 2022 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No.   1703002846 A/B (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: May 24, 2023
Decided: August 8, 2023

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court.  **AFFIRMED.**

PATRICK J. COLLINS, Esquire, COLLINS & PRICE, Wilmington, Delaware, *for Appellant Khalif Watson*.

ANDREW J. VELLA, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice:

At issue in this appeal is the prosecution's use of Khalif Watson's prior felony convictions during cross-examination and in closing argument. The admissibility of the convictions is not at issue. Instead, Watson contends that his conviction on weapons and resisting-arrest charges cannot stand because the prosecutor asked him questions about his prior convictions that he had already answered on direct examination and then argued—perhaps only implicitly—that those convictions showed his propensity to possess weapons. Both of those tactics, the appellant argues, were not only objectionable (though the appellant did not object in real time), but also amounted to prosecutorial misconduct so clearly prejudicial to his substantial rights that we should reverse his convictions. We disagree.

The questions the prosecutor asked on cross-examination, while arguably objectionable as cumulative, did not amount to prosecutorial misconduct. Neither did the prosecutor's closing statement, whether viewed separately or together with his cross-examination of Watson, suggest that the jury should conclude that Watson's prior convictions, both involving firearms, were indicative of his propensity to possess firearms. And even if we were to accept Watson's characterization of the prosecution's use of his prior convictions, he has failed to persuade us that the ensuing error was so clearly prejudicial of his rights as to

2

compromise the fairness and integrity of his trial. Accordingly, we affirm the judgment of the Superior Court.

I

A

In the early afternoon hours of March 4, 2017, Officer Christopher White and Officer Hector Cuadrado of the Wilmington Police Department were driving a fully marked police cruiser northbound on Washington Street in Wilmington when they saw Watson walking on the sidewalk.[1] Officer White knew that Watson was the subject of an active capias. As Watson crossed the street, the officers, intending to conduct a pedestrian stop, pulled the police car into the lane of oncoming traffic.

The officers, who were trained to identify armed gunmen, observed Watson as he stopped, took two steps backwards, and "bladed" his body away from them while touching his right side—a sign that Watson was armed.[2] Officer White said, "Khalif, don't run." But Watson, who had two prior felony convictions, ran anyway, and Officer White chased him on foot. The officers noticed that as Watson ran, he held one arm close to his body while the other swung freely—another sign that Watson was carrying a firearm.[3]

---

[1] App. to Opening Br. at A136–38.
[2] *Id.* at A191. Officer White described "blading" as "turning their body and whatever they're trying to conceal away from us." *Id.* at A143.
[3] *Id.* at A143–44, A193.

3

Watson, who had a close-knit family, ran to his sister Rasheda Hinson's house on Washington Street. Officer White, however, caught up with Watson before he could get inside, and the two men crashed through the front door and into the living room where they struggled on the floor. Watson, lying face down on the floor, kept his right hand under his torso. Officer White was on top of Watson, shouting, "[g]ive me your hands, give me your hands, put your hands behind your back."[4] According to Officer White, Watson then slid a silver handgun across the floor and under the couch. Meanwhile, Officer Cuadrado entered the home and heard Officer White say, "he just threw it under the couch."[5] During the struggle, Watson's sister Omisha Watson, came downstairs from the second floor and entered the living room.

According to the officers, Omisha reached under the couch, retrieved the gun,[6] and left the house with it. According to several defense witnesses, however, Omisha had the gun in her hand when she came down the stairs, "stepped over" Watson and the officers, and then ran out the door with the gun.[7] Omisha claimed that she had found the gun in a barbeque grill behind her house a year earlier and that she had it in her possession since discovering it.

---

[4] *Id.* at A146.
[5] *Id.* at A148, A195.
[6] Officer White testified that he saw Omisha pick up the gun, but Officer Cuadrado was only certain that he saw her pick up an "object." *Id.* at A148, A185.
[7] *Id.* at A247, A283 (Watson's sister, Rasheda, testified that Omisha pulled the gun out of a white pocketbook and that she had heard of Omisha's gun but never seen it before.). *But see* A273 (Watson's sister, Asha Watson, who was present in the living room, testified that she "did not see Omisha" at any point during the altercation.).

4

Officer White, who observed Omisha pick up the gun, chased her outside, leaving Officer Cuadrado to handle Watson alone. Once outside, Officer White told Omisha to drop the gun. Omisha, however, attempted to throw the gun under a parked car; it bounced off a car and landed in the street. Officer White recovered the gun, which was loaded and detained Omisha. As they walked back towards Rasheda's house, Watson, fleeing from the residence, started to run on Washington Street. Officer White regained custody of Watson approximately 200 feet from the home.

B

On April 3, 2017, a grand jury indicted Watson and Omisha, charging Watson with resisting arrest, carrying a concealed deadly weapon, possession of a firearm by a person prohibited, and possession of ammunition by a person prohibited, and Omisha with resisting arrest and hindering prosecution. At an October 2017 final case review, Watson rejected a plea offer to PFBPP with a State recommendation for 10 years of unsuspended Level V time, and his case was set for trial. Omisha, who was then-pregnant, went in a different direction; she pleaded guilty to resisting arrest and was sentenced. As part of her plea agreement, she signed a statement agreeing that she ran from police while holding a gun discarded by Watson.[8]

---

[8] *Id.* at A402 (Omisha Watson Plea Agreement) ("The defendant agrees that she did, on March 4, 2017, flee from the police from 2938 N. Washington Street, Wilmington, Delaware, while holding the gun discarded by Khalif Watson.").

5

At Watson's request, his charges were bifurcated for trial purposes, with the resisting-arrest and concealed-deadly-weapon charges assigned to an "A" case and the person-prohibited charges deferred to a "B" case. The "A" case was tried before a jury, while Watson elected to have a bench trial in the "B" case. The "A" case trial went first.

C

As mentioned earlier, the parties disputed whether Watson ever possessed the gun in question. At trial, Watson's defense, told through the testimony of Watson and his three sisters, was that the gun was exclusively possessed by his sister, Omisha.[9] That narrative was at odds with the State's account: that Watson possessed the gun, discarded it during a struggle with the police, and then Omisha attempted to abscond with it.

After Watson determined that he would take the stand in his own defense, the State asked the court whether it could inquire into Watson's prior person-prohibited conviction to challenge the credibility of his motive for running from the police. Conceding that, normally, the State is "limited to asking the defendant the date of the conviction and what it was for[,]" the State argued that Watson "would have been aware that he faced serious consequences for possessing a firearm and that it

_____

[9] All three of Watson's sisters testified that they did not see Watson with the gun and that the couch sat too low to the ground for the gun to slide underneath it, and two of the sisters also testified that Omisha had exclusive possession of the gun.

6

would be an appropriate question which goes to the defendant's motives and actions as to why he ran from the police[.]"[10] Defense counsel thought such questioning would be inappropriate and that it was not relevant to the "A" trial. The court ruled that, "[a]t this point, I'm going to limit [the questioning] to the crime and the date."

Defense counsel informed the court, outside the presence of the jury, that he intended "to ask [Watson] on direct about prior felony convictions [],"" and noted his expectation that the court would give "a limiting instruction to the jury about what that means."[11] The trial judge, still outside the presence of the jury, read the instruction he intended to give at the end of trial to counsel's apparent satisfaction. We address the substance of this instruction later.

During direct examination, Watson testified that he ran from the police when the police cruiser approached him on Washington Street, because, as a recent parent, he felt a powerful desire to see his son. According to Watson, he believed that the police would take him to jail that day, because he "had an open capias for unpaid fines[.]"[12] Asked why he resisted arrest, Watson also stated that he "was not trying to go back behind walls."[13]

---

[10] App. to Opening Br. at A239.
[11] *Id.* at A296–97.
[12] *Id.* at A306.
[13] *Id.* at A309.

7

Then, defense counsel asked Watson about his two prior felony convictions and whether he had a gun on the day in question, stating in relevant part:

Q. Were you in possession of a firearm that day?

A. Not at all, sir, at all, no.

Q. Mr. Watson, have you previously been convicted of any felony charge?

A. Yes, sir.

Q. How many times?

A. Twice, sir.

Q. When was the first one?

A. 2010, April 2010.

Q. What was that charge that you were convicted of?

A. I pled guilty to a robbery second, sir.

Q. And when was the second charge?

A. 2012, sir.

Q. And what was that charge?

A. Possession of a firearm, sir.

Q. Were you in possession of a firearm on March 4, 2017?

A. No, sir.[14]

---

[14] *Id.* at A308.

No contemporaneous limiting instruction was given by the court.

On cross-examination, the State reexamined Watson about his two prior felony convictions, suggesting that the firearm conviction was in 2013, and not 2012, and then asked him immediately afterwards whether he was in possession of a firearm on the day in question:

Q. All right. Now, [defense counsel] asked you, you have two prior felony convictions?

A. Yes, sir[.]

Q. A robbery second from 2010?

A. Yes, sir.

Q. And you testified that your federal felony for possession of a firearm charge was from 2012. Would you believe me if I told you that the conviction was actually from 2013?

A. That case, I got arrested in 2012.

Q. But the sentencing, when the conviction was entered.

A. I was locked up nine months before I got sentenced. So, I got locked up in August, so, yes, it could have been 2013, yes, sir.

Q. And your testimony today is that you didn't have a gun on you?

A. Not at all, [sir], no.[15]

Before closing arguments, the State renewed its application to argue in closing that Watson knew that he was "a person prohibited, prohibited from having a

---

[15] *Id.* at A318–19.

firearm" and that is why he fled—i.e., that he did not run because of the open capias and his desire to see his son.[16] The inference, the State argued, "goes only to the credibility of the defendant's purported reason for having run [from the police]."[17]

Ultimately, the court ruled that the State could argue in its closing, without mentioning Watson's person prohibited status, that "maybe he ran because he was a convicted felon." The following exchange led to the court's ruling:

> The Court: There's testimony that he was a felon.
>
> [Defense counsel]: He was a felon and that he ran. And I suppose you can make [a] nexus that, because of a prior conviction, he didn't want to have police contact. But when you leap to the person prohibited that's where you're going beyond the evidence in this case. . . .
> …
> The Court: You can argue that maybe he ran because he was a convicted felon. You cannot take it to he was a person prohibited.
>
> [State]: I understand the distinction. . . .[18]
>
> Watson has not appealed this ruling.

In its closing argument, the State reviewed and evaluated the relative credibility of the testimony of each witness. Given that the parties' narratives were "completely different," the State asked the jury to make credibility determinations

---

[16] The State argued that "[t]he jury is aware of those facts and it goes to the defendant's credibility about whether or not why he ran was due to these capiases or because he possessed a firearm." *Id.* at A324–28.

[17] *Id.* at A325.

[18] *Id.* at A326–28.

that would make a "harmonious story of it all."[19]  The prosecutor argued in relevant

part:

> And, finally, the defendant.  You get to evaluate his credibility.  He was a felon.  He said he didn't have a gun.  He's been convicted of robbery in the second degree, and felony possession of firearm before.
> …
> You have two narratives that are completely different . . . What do you do?  How do you evaluate credibility?  Well, jury instructions.
> …
> The jury instructions say that you have to make one harmonious story of it all. . . . [T]he State submits to you that the harmonious story to be made of this case is that the defendant, who is a felon, was in possession of a firearm.  The police saw him, he got startled, he didn't know what to do, he ran away, and he got caught tossing that gun.[20]

After counsel's closing arguments, the court gave a limiting jury instruction

regarding the proper use of prior convictions as evidence:

> You may consider evidence that the defendant was previously convicted of a crime for the sole purpose of judging the defendant's credibility, or believability.  Evidence of a prior conviction does not necessarily destroy or damage the defendant's credibility, and it does not mean that the defendant has testified falsely.  It is simply one of those circumstances that you may consider in weighing the defendant's testimony.  You may not consider evidence of the defendant's prior convictions in deciding guilt or innocence.  You may only consider such evidence in judging the defendant's credibility.[21]

The jury returned guilty verdicts in the "A" case on the resisting arrest and

CCDW charges,[22] and after that, the trial judge found Watson guilty on the two

---

[19] *Id*. at A343.
[20] *Id.* at A341–43.
[21] *Id.* at A384.
[22] *Id.* at A389–90.

11

person-prohibited charges in the "B" case.[23] The Superior Court sentenced Watson to ten years of unsuspended Level V time, followed by community supervision.

In this direct appeal, Watson argues that his convictions should be reversed because of the prosecutor's misconduct during cross-examination and closing argument. More specifically, Watson claims that the prosecutor's asking of questions on cross-examination about Watson's prior convictions after he had already testified about them on direct examination and the "injecting [of] propensity evidence" amounted to reversible misconduct on the prosecutor's part.

## II

## A

"Our analysis of whether alleged prosecutorial misconduct warrants a reversal of a defendant's conviction begins with whether the issue was fairly presented below."[24] Here, because Watson failed to object to the alleged misconduct at trial, we review "only for plain error."[25] But we first engage in a *de novo* review to determine whether the prosecutor's actions rise to the level of misconduct.[26] If we determine that no misconduct occurred, the analysis ends there; only if we find misconduct would we engage in plain error analysis.[27]

---

[23] *Id.* at A369.
[24] *Baker v. State*, 906 A.2d 139, 148 (Del. 2006).
[25] *Saavedra v. State*, 225 A.3d 364, 372 (Del. 2020).
[26] *Id.*
[27] *Id.*

12

For an error to be "plain" under this standard, it "must be so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial.[28] Findings of plain error are limited to material defects that are "apparent on the face of the record[,] . . . basic, serious and fundamental in their character. . . ."[29]

B

Although this Court has never stated a precise definition of "prosecutorial misconduct,"[30] we have looked to the American Bar Association standards for the prosecution function when assessing the propriety of a prosecutor's trial tactics. Of relevance here are two such standards. The first, which addresses a prosecutor's presentation of evidence, states in pertinent part:

> *The prosecutor should not bring to the attention of the trier of fact matters that the prosecutor knows to be inadmissible*, whether *by* offering or displaying inadmissible evidence, *asking legally objectionable questions*, or making impermissible comments or arguments. If the prosecutor is uncertain about the admissibility of evidence, the prosecutor should seek and obtain resolution from the court before the hearing or trial if possible, and reasonably in advance of the time for proffering the evidence before a jury.[31]

The second standard implicated by Watson's claims defines a prosecutor's duty when presenting closing argument.

---

[28] *Dutton v. State*, 452 A.2d 127 (Del. 1982).
[29] *Wainwright v. State*, 504 A. 2d 1096, 1100 (Del. 1986).
[30] *See Bunting v. State*, 907 A.2d 145, 2006 WL 2587074, at *3 (Del. Sept. 7, 2006) (TABLE) ("We have not stated an all-inclusive definition of prosecutorial misconduct.").
[31] *Crim. Justice Standards for the Prosecution Function* Standard 3–6.6, AM. BAR ASS'N (2017), https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEditi on/ (emphasis added).

In closing argument to a jury (or to a judge sitting as trier of fact), the prosecutor should present arguments and a fair summary of the evidence that proves the defendant guilty beyond reasonable doubt. The prosecutor may argue all reasonable inferences from the evidence in the record, unless the prosecutor knows an inference to be false. . . . The prosecutor should not . . . argue inferences that the prosecutor knows have no good-faith support in the record. . . . The prosecutor should not make arguments calculated to appeal to improper prejudices of the trier of fact. The prosecutor should make only those arguments that are consistent with the trier's duty to decide the case on the evidence, and should not seek to divert the trier from that duty. . . .[32]

As will be developed below, we are not persuaded that the prosecutor crossed any of the lines drawn by these standards. And even if we were to conclude otherwise, any missteps did not jeopardize the fairness and integrity of Watson's trial.

## III

It is unclear to us whether Watson is claiming two separate acts of misconduct, one by asking repetitive questions during cross examination and the other by making a propensity argument during summation or whether he sees these two acts as separate elements of one impermissible tactic. Given this uncertainty, we find it helpful to analyze the two acts as giving rise to two distinct claims of misconduct before considering them and their cumulative effect, if any, together.

---

[32] *Id.* Standard 3–6.8.

## A

We address first Watson's assertion that the State committed prosecutorial misconduct when it "reintroduce[ed]" Watson's prior convictions during cross-examination. Watson acknowledges that he did not object to the prosecutor's questions at trial and that hence this claim is subject to plain-error review.

Standing alone, the repetition of questions on one occasion during cross-examination that defense counsel asked Watson on direct examination is not prosecutorial misconduct. Granted, a timely objection might have been sustained in accordance with this Court's holding in *Martin v. State*.[33] In that case, decided before the adoption of the Delaware Rules of Evidence,[34] we noted that "[t]he tendency to judge on the basis of a bad general record is too strong to encourage repetition of it."[35] Thus, we ruled that "the State should not be permitted to simply develop a repetition of what came out [about a defendant's prior felony convictions] during direct testimony . . . [unless] the State is prepared to go beyond what was developed during direct."[36]

But the mere asking of an objectionable question that does not elicit inadmissible testimony—only arguably repetitious testimony—cannot in fairness be

---

[33] 346 A.2d 158 (Del. 1975).

[34] The State has argued that *Martin*'s central precept has been supplanted by D.R.E. 609 and the cases interpreting that rule. Because we have concluded that, even if objectionable, the questions did not amount to prosecutorial misconduct, we need not address this argument.

[35] *Martin*, 346 A.2d at 160.

[36] *Id*.

15

labeled misconduct. The applicable ABA standard, to be sure, cautions prosecutors not to ask legally objectionable questions, advice all trial counsel should strive to follow. Yet, under the standard, such questions are not deemed to be misconduct unless they bring to the jury's attention "matters that the prosecutor knows to be inadmissible."[37] Here, such was quite evidently not the case: Watson himself brought his criminal record to the jury's attention.

### B

Turning to Watson's claim that the prosecutor's closing argument improperly put propensity evidence before the jury, it bears noting that the claim falls short of accusing the prosecutor of drawing a crystal-clear line between the evidence and Watson's propensity to possess firearms. Instead, Watson colors the prosecutor's tactics as an "insinuation of propensity."[38] And to construct his argument that the prosecutor's summation improperly injected a propensity argument, Watson focuses on two seemingly unconnected statements.

In the first, the prosecutor clearly linked Watson's prior convictions to the jury's role in assessing his credibility: "And finally, the defendant. You get to evaluate his credibility. He was a felon. He said he didn't have a gun. He's been convicted of robbery in the second degree, and felony possession of a firearm

---

[37] *See* AM. BAR ASS'N, *supra* note 31, Standard 3–6.6.
[38] Opening Br. at 26.

before."[39]  In the second, coming three transcript pages later—after discussing the State's and Watson's competing factual narratives and the facts that bear on credibility findings—the prosecutor argued:

> The jury instructions say that you have to make one harmonious story of it all.  Ladies and gentlemen of the jury, the State submits to you that the harmonious story to be made of this case is that the defendant, who is a felon, was in possession of a firearm.  The police saw him, he got startled, he didn't know what to do, he ran away, and he got caught tossing that gun.[40]

Watson interprets these two statements when conjoined, as delivering the message "essentially that Mr. Watson, given his propensity for having [a] firearm as evidenced by his prior conviction was more likely to have a firearm on the date of his arrest."[41]  This, Watson aptly notes, is impermissible under D.R.E. 404(a), which provides that  "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."  Likewise, under D.R.E. 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

In our view, Watson's contention that the prosecution used Watson's felony record in service of a propensity argument falls short of the mark.  To start with,

---

[39] App. to Opening Br. at A340–41, *quoted in* Opening Br. at 29.
[40] *Id*. at A343.
[41] Opening Br. at 29.

17

Watson tellingly does not point to a single statement in the prosecution's summation that could fairly be characterized as misstating the law or explicitly asking the jury to infer from Watson's criminal record that he was predisposed to possess firearms. Moreover, the prosecutor's reference to Watson's felony convictions were firmly embedded in his argument about the competing narratives of the police witnesses who, on the one hand, placed the firearm in Watson's hands and Watson's witnesses, including himself, who said that the gun was Omisha's all along. The prosecutor implored the jury to focus on the discrepancy as "the ultimate issue" for the jury to decide: "[L]et's talk about the ultimate issue. Every trial comes down really to one question. And in this trial, the question is, who do you believe?"[42]

The prosecutor then meticulously contrasted the testimony of the police officers and that of Watson and his family members, noting that they stood in diametric opposition to each other: "There is no middle ground here."[43] He then identified the flaws in the defense witnesses' testimony, especially Omisha's, which, according to the prosecutor was motivated by a desire "to get her brother out of trouble."[44] Indeed, the prosecutor observed how Omisha had "change[d] her story day-to-day depending on what's convenient for her and who she needs to get out of

---

[42] App. to Opening Br. at A337.
[43] *Id*. at A338.
[44] *Id*. at A339.

18

trouble."[45]  And then, after critiquing the "confused" testimony of other family members, the prosecutor asked the jury to consider Watson's credibility, tying it tightly to Watson's status as a convicted felon: "[F]inally, the defendant. You get to evaluate his credibility. He was a felon. He said he didn't have a gun. He's convicted of robbery in the second degree, and felony possession of firearm before. The two narratives are simply not compatible."[46]

But this was just the beginning of the prosecutor's discussion of how the jury should approach its credibility determinations. Aside from Watson's felony convictions—fair game by all accounts on the issue of his credibility—the prosecutor ticked off the factors that typically bear on a fact-finder's weighing of a witness's credibility: means of knowledge; strength of memory; opportunity for observation; motivations of the witness; and bias, prejudice, or interest of the witness.

Immediately upon concluding this discussion of witness credibility—the "ultimate issue" in the trial, given the disparate accounts of the critical events provided by the police and the defense witnesses—the prosecutor ended his opening summation with the second statement to which Watson now takes offense:

> The jury instructions say that you have to make one harmonious story of it all. Ladies and gentlemen of the jury, the State submits to you that the harmonious story to be made of this case is that the defendant, who

[45] *Id.*
[46] *Id.* at A340–41.

19

is a felon, was in possession of a firearm. The police saw him, he got startled, he didn't know what to do, he ran away, and he got caught tossing that gun.[47]

This statement sat comfortably with the trial judge's pre-argument ruling, which Watson has not challenged on appeal, that the prosecutor was permitted to argue "that maybe [Watson] ran because he was a convicted felon."[48] And what is more important, the statement, very simply, does not suggest that the evidence of Watson's prior convictions—again, evidence Watson himself introduced in the first instance—evinced a propensity to possess firearms.

Nor, in our view, do the statements the prosecutor made in closing viewed together with the challenged cross-examination questions cross the line drawn by D.R.E. 404(b). The questions themselves put nothing before the jury that it had not already heard. And the purport of the prosecution's closing was that the jury should not, by adopting the version of events offered by Watson and his family members, find that the police officers had testified falsely. In this context, it was entirely proper for the prosecutor to refer to Watson's felony convictions for the purpose of attacking his credibility. The prosecutor's arguments, as we see them, were consistent with the jury's duty to decide the case on the evidence and did not seek to

---

[47] *Id*. at A343.
[48] *Id*. at A328.

divert the jury from that duty. Accordingly, we reject Watson's accusation of prosecutorial misconduct.

C

Even if we were to accept Watson's claim that the references to his prior felony convictions were designed to plant a seed in the jurors' minds that Watson was predisposed to possess firearms, he has not shown plain error. Said another way, the prosecutor's cross-examination of Watson and closing argument were not so clearly prejudicial to Watson's substantial rights as to jeopardize the fairness and integrity of his trial.

To determine whether prosecutorial misconduct is clearly prejudicial to a defendant's substantial rights, this Court weighs three factors: (1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken to mitigate the effects of the error. This is known as the *Hughes* test after our 1981 decision of the same name.[49] As former Chief Justice Steele observed in *Baker v. State*, "[t]he factors in the *Hughes* test are not conjunctive and do not have the same impact in every case: for example, one factor may outweigh the other two. Moreover, we apply the test itself in a contextual, case-by-case, and fact-sensitive manner."[50]

---

[49] *Hughes v. State*, 437 A.2d 559 (Del 1981).
[50] *Baker*, 906 A.2d at 149. We also noted that where misconduct does not warrant reversal under the *Wainwright* plain-error standard, we then apply an additional analytical step in accordance with

21

If the prosecutor's approach to cross-examination and closing argument were as characterized by Watson, we grant that the issues affected by the error were central to the jury's consideration of Watson's guilt. The principal issue under the concealed-deadly-weapon charge was whether Watson possessed the firearm found by the police. If the jury were likely, by virtue of the prosecution's tactics, to have considered the evidence of Watson's prior convictions to be probative of whether he possessed a firearm on the date of his arrest, that consideration would have directly affected the issue of Watson's possession. Thus, the second *Hughes* factor would appear to weigh in Watson's favor.

But the other two factors point emphatically in the other direction. As to the third *Hughes* factor—the steps taken to mitigate the error—the trial court instructed the jury that it was permitted to consider evidence of Watson's prior convictions but "for *the sole purpose* of judging [his] credibility, or believability."[51] The court emphasized this limitation by explicitly telling the jury that it was not permitted to consider the convictions as evidence of guilt or innocence, then repeated that the jury "may only consider such evidence in judging the defendant's credibility."[52]

---

*Hunter v. State*, 815 A.2d 730 (Del. 2002). Under the *Hunter* analysis, we consider whether the misconduct was part of a persistent pattern reflecting a prosecutorial disregard for previous admonitions. Watson has not argued that a *Hunter* analysis is appropriate in this case.

[51] App. to Opening Br. at A384 (emphasis added).
[52] *Id.*

22

Watson attempts to discredit the efficacy of the court's jury instruction, noting that it was not given contemporaneously with the (now hypothetically considered) error. He also claims that the error was so egregious that it fits within the category of plainly inadmissible and prejudicial evidence that a jury cannot "unhear and unthink."[53] In our view, Watson's opinion of the jury's ability to abide by the court's instruction in this instance is unduly distrustful of the jurors' fidelity to their oath; it ignores the general rule that a reviewing court usually presumes that jurors follow the trial court's instructions.[54] Moreover, we find Watson's portrayal of the gravity of the purported error to be overwrought. The third *Hughes* factor does not involve a search for steps taken to eliminate the error, only to mitigate it. The court's instruction did that here.

We turn then to the closeness of the case. Watson, pointing to "the divergent testimony of the witnesses"[55] and the absence of forensic evidence connecting him to the firearm, believes that his was a close case. Once again, we disagree with Watson. Both Officer White and Officer Cuadrado testified that, upon their approach, Watson "bladed" in a manner suggestive of an effort to conceal an object

---

[53] Reply Br. at 7 (quoting *Phillips v. State*, 154 A.3d 1146, 1162 (Del. 2017) (Strine, C.J., concurring)).

[54] *Baker*, 906 A.2d at 155 (recognizing that this Court "customarily presume[s] that the jury followed the trial judge's [general] instruction," but also that "at some point our judgment about the prejudicial nature of the improper conduct will overcome these presumptions.").

[55] Opening Br. at 30.

from their vision. Both officers observed that Watson was holding one arm close to his body as he fled.

Officer White's testimony about what happened after he caught up with and was wrestling with Watson on the living room floor was vivid:

> While . . . I'm . . . struggling with him to get his hands behind his back, in one motion, he's actually laying prone, so his stomach is down, his hand's underneath –his left hand is free, he rotates his body underneath me. So he actually spins, and while he does that, his right hand comes out under the left side and I see a silver color firearm slide from his right hand underneath the couch . . . .[56]

Officer White then described how, while he "continue[ed] to struggle" with Watson, "[Watson's] sister, Omisha, comes actually past us, reaches under the couch, retrieves the firearm [he] just saw Khalif throw, and runs out the front door and slams the door behind her."[57] Officer Cuadrado also confirmed that he saw Omisha reach under the couch, grab an object, and run out of the house. And when Officer White was chasing Omisha down Washington Street, commanding her to "drop the gun," he saw her "try[] to throw the gun under a car."[58] Officer White picked up the loaded firearm and soon after that took Omisha into custody. Omisha herself in her written plea agreement admitted that "she did, on March 4, 2017, flee from the police from

---

[56] App. to Opening Br. at A146–47.
[57] *Id*. at A148.
[58] *Id*. at A149.

2938 N. Washington Street, Wilmington, Delaware, while holding the gun discarded by Khalif Watson."[59]

Admittedly, Watson called witnesses who gainsaid the officers' testimony. He himself took the stand and denied having a firearm that day, claiming to have run from the police—in a normal manner—because he was aware of the outstanding capias and expected to go to jail if caught. Omisha testified that she carried the firearm from the second floor and out the door of Rasheda's Washington Street residence. In Watson's telling, "Omisha testified that she had the firearm all along, in a white bookbag."[60] But Watson's other sister, Asha, who stood only feet away as Officer White struggled on the floor with Watson, denied even seeing Omisha, let alone carrying a gun down the stairs. Asha testified that she "didn't pay attention," because her focus was "mainly on the officer and [her] brother."[61]

We disagree with Watson's contention that, because the State and the defense offered "divergent testimony," leaving the jury "to decide which cohort of witnesses was more credible," this was a close case. In essence, the defense was asking the jury to find that Officers White and Cuadrado fabricated their eyewitness testimony, a class D felony under the Delaware Criminal Code,[62] this despite Watson's status

---

[59] *Id*. at A402.
[60] *Id*. at A278–79.
[61] *Id.*
[62] Under 11 *Del. C.* § 1223, "[a] person is guilty of perjury in the first degree when the person swears falsely and when the false statement consists of testimony and is material to the action,

as a convicted felon and obvious self-interest, Omisha's written acknowledgement of Watson's guilt, and Asha's odd account—seemingly inconsistent with Omisha's—that she never even saw Omisha during the incident. It was reasonably predictable that the jury would make short work of this defense and return guilty verdicts.

In sum, the *Hughes* factors militate against a finding of plain error.

IV

Through the years, this Court has cautioned prosecutors, in light of their obligation "to seek justice within the bounds of the law, not merely to convict,"[63] to take care when addressing juries, lest their argument be misleading, inflammatory, and prejudicial. Our decision today should not be seen as relaxing the standards to which we hold prosecutors as the public's representatives in the administration of criminal justice. To the contrary, we re-affirm that it is, in the memorable words of Justice Southerland nearly a century ago "as much [a prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."[64] A prosecutor "may strike hard blows [but] he is not at liberty to strike foul ones."[65] We discern no foul blows in

---

proceeding or matter in which it is made." Perjury in the first degree is a class D felony, carrying up to eight years in prison.

[63] *See* AM. BAR ASS'N, *supra* note 31, Standard 3–1.2.

[64] *Berger v. United States*, 295 U.S. 78, 88 (1935).

[65] *Id*.

the prosecution's conduct in this case.  We therefore affirm the Superior Court's judgment.